435 P.2d 874

George TIPTON, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona and Wells Stewart Construction Company, Inc., Respondents.

No. I CA–IC 146.

Court of Appeals of Arizona.

Jan. 8, 1968.

Rehearing Denied Jan. 31, 1968.

Review Denied March 5, 1968.

Rees, Estes & Browning, Tucson, by, Donald Estes, for petitioner.

Robert K. Park, Chief Counsel, by, Donald L. Cross, Phoenix, for respondent The Industrial Commission of Arizona.

DONOFRIO, Judge.

This is a writ of certiorari to review the lawfulness of the decision of The Industrial Commission of Arizona finding petitioner's claim noncompensable.

Petitioner claims to have suffered an injury by accident arising out of and in the course of his employment due to eating a spoiled sandwich consisting of liverwurst, cheese and mayonnaise. Briefly, the facts are: That petitioner was employed as a heavy duty mechanic for respondent employer, working in the construction of Interstate Highway No. 8 at Mohawk Pass. The location of this employment was 13 miles from the nearest town. Due to the location and a thirty-minute lunch period, petitioner was accustomed to carrying his lunch to work. On November 4, 1965 the petitioner ate the sandwich consisting of liverwurst, cheese and mayonnaise which had been prepared and left in the refrigerator by his wife the night before. In the early morning she placed the sandwich in his lunch bucket which was kept in the cab of his truck. The cab was in the sun. Because of the requirements of his employment he was unable to eat the sandwich until late in the afternoon. This was due to the fact that the superintendent required him to repair vehicles while the operators took their lunch breaks. Approximately thirty minutes after ingesting the sandwich he felt sick at his stomach and experienced nausea which became progressively worse. Later he vomited during the night. He was absent from work on November 5 and was hospitalized on November 6 with the admitting diagnosis of acute gastroenteritis and acute exacerbation of chronic gout. He suffered an acute drug reaction while hospitalized, and was later transferred to the Veterans Hospital at Tucson. He has been unable to work since.

A workmen's report of injury filed by petitioner was denied by findings and award for noncompensable claim. A petition for hearing was duly filed and hearings held in Yuma and Phoenix after which the noncompensable award was affirmed. The question before this Court is whether the evidence reasonably supports the award and findings of The Commission.

At the hearing in Yuma the attending physician, Dr. Robert A. Stratton, testified that based upon the complaints, tests and examinations the petitioner had gastroenteritis separate from gouty arthritis; that the sandwich and gastroenteritis were medically connected and the gastroenteritis caused a flare-up of the preexisting gout. Petitioner contends this testimony was corroborated by Doctors Henry Meyer and G. Ca'vin Williamson.

At the Phoenix hearing Dr. Charles I. Fisher, an internist, testified it was his opinion that the gastroenteritis was due to uremic poisoning produced by his own gout, rather than by ingested food.

Petitioner urges that there is no conflict in the medical evidence which is all favorable in showing a compensable injury. He seeks to justify this position by stating that the testimony of Dr. Fisher cannot be treated as reasonable evidence. In effect he says that the only fact mentioned in the doctor's evidence is from the hospital reports which show a moderate elevation of uremic acid, and that the remainder of his testimony was based on a review of the file.

Respondent, on the other hand, argues that there is no competent medical evidence supporting the position that the sandwich was tainted and caused petitioner's condition and therefore petitioner has failed to sustain the burden of proving the requirement that he had suffered an injury by accident. Respondent sums up the medical testimony as being contrary to petitioner's position. It interprets the testimony of Dr. Stratton as being to the effect that the gastroenteritis symptomatology could be due either to an infection process or to the onset of gouty arthritis, and the testimony of Dr. Meyer as being to the effect that the doctor did not know whether the gouty arthritis could produce said symptomatology. Dr. Fisher's testimony was to the effect that the gout itself could and probably did cause the symptoms; that in addition thereto there was evidence supporting the medical opinion that the gastroenteritis symptoms might have been induced by drugs taken to control the gout.

This Court does not weigh the evidence in reviewing an award of the Commission, but must consider the evidence in a light most favorable to sustaining the award. Donaldson v. Industrial Commission, 2 Ariz.App. 172, 407 P.2d 111 (1965). The evidence supports the finding that petitioner's condition was a flare-up of his preexisting gouty arthritis having no causal relationship to the conditions of his employment or to the eating of the sandwich, and we would hold that petitioner has failed in sustaining his burden of proof.

In support of our holding, we will cite the following few excerpts from the testimony of Doctors Stratton and Meyer, followed by Dr. Fisher's, also that of petitioner upon which some of Dr. Fisher's testimony is based:

*Dr. Stratton*

"BY MR. ESTES:

"Q * * * Now, are the problems with his stomach, the nausea, the vomiting, could that be connected with the sandwich being left in the sun for some period of time?

"A It could be.

"Q Is it a medical possibility that the sandwich could have caused it, assuming what I've told you is correct, sir?

"A It's a possibility, among others.

   *     *     *     *     *     *

*Dr. Meyer*

"BY MR. ESTES:

"Q * * * Now, can you see any connection between the nausea, stomach upset to the gout?

"A Well, they could be related; I can't say they were related.

"Q To a medical probability?

"A They could have been related.

"Q Is it a reasonable medical probability that the result of nausea was from eating the sandwich?

"A. Well, how many attacks had he had previously? When was the attack before this, what medicines were given? He was on steroids for a long time is the impression I got.

\*   \*   \*   \*   \*   \*

"Q   Which would be cortisone?

"A   Cortisone or one of the equivalents, prednisolone. I imagine, I don't know how—I mean I don't know where to put this in the probability it could happen, yes, certainly.

"Q   I'm not asking you to state that it did happen, but it's in the realm of medical probability that this is the chain of causation?

"A   I don't know whether it's probable or possible, I wouldn't know where to put it and how far, how much certainty I would put on it, but it certainly could happen; I don't know whether it would happen every time.

\*   \*   \*   \*   \*   \*

*Dr. Fisher*

"BY MR. CROSS:

"Q   And this was for the purpose of rendering an opinion with relationship between Mr. Tipton's hospitalization and an incident of eating the supposedly contaminated sandwich?

"A   Yes, sir.

"Q   Based on a review of these records did you form an opinion?

"A   Yes, I did.

"Q   What is that opinion?

"A   According to my report on November 13, 1966, after review of the man's history of gout of 23 years' duration, evidence of kidney infection and uremia, it was my opinion that his uremic poisoning rather than the product of any ingested food or infections processes.

\*   \*   \*   \*   \*   \*

*Mr. Tipton*

"BY MR. ESTES:

"Q   On November 4, 1965 about what time did you start noticing some physical difficulties?

"A   Well, just late in the afternoon after I ate that sandwich, about 30 minutes, or maybe not even that long, I kind of got feeling funny in my stomach, sick, you know.

\*   \*   \*   \*   \*   \*

"BY MR. CROSS:

"Q   And then when did you eat in the afternoon?

"A   Well, it was late, it was around 4:00 o'clock, I'd say, offhand; I'm not sure of that.

"Q   And then shortly after that, you say perhaps within 30 minutes you started—

"A   Feeling sick at my stomach.

"Q   Got this nauseated sensation in your stomach, but you completed work?

"A   Yes.

\*   \*   \*   \*   \*   \*

*Dr. Fisher*

"BY MR. CROSS:

"Q   If following ingestion of this particular sandwich approximately 30 minutes afterwards the person experienced nausea, and subsequently thereto the nausea continued, there was an episode of diarrhea, headaches, this type of thing, would this be consistent with food poisoning?

"A   Bacteria, or even viral organisms in most of the food poisonings, or amoebic organisms require somewhere between six to twelve hours to germinate in the bowel before symptoms become apparent.

\*   \*   \*   \*   \*   \*

"Q   Given this history of the sandwich sitting in the sun, would a chemical poison be likely to result?

"A   No.

"Q   This would be a bacterial agent?

"A   Yes, incubation of bacterial organisms if it was going to be an inciting cause."

\*   \*   \*   \*   \*   \*

These few excerpts would lead us to the conclusion that the medical testimony upon

which petitioner bases his claim was somewhat weak as against the more positive evidence of Dr. Fisher whose testimony was based on some of the facts submitted by petitioner. We do not find that Dr. Fisher's testimony having been rendered on facts contained in the claims' file makes it any the less acceptable than the other medical evidence in this case.

Finding that there is substantial evidence upon which The Commission could have based its award and findings, we need not pass upon the question as to whether an injury to the petitioner-employee by eating the contents of his own lunch which may have been tainted by the circumstances is an accidental injury within the meaning of the Workmen's Compensation Law.

The award is reasonably supported by the evidence.

Affirmed.

CAMERON, C. J., and STEVENS, J., concur.